1    **WO**

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7                 **FOR THE DISTRICT OF ARIZONA**

8

9    Eddie Ramirez,                          No. CV-17-08026-PCT-BSB

10              Plaintiff,                    **ORDER**

11   v.

12   Kingman Hospital Incorporated, et al.,

13              Defendants.

14

15          Defendant Kingman Hospital, Inc., d/b/a Kingman Regional Medical Center

16   ("KRMC") moves for summary judgment on the following claims in the First Amended

17   Complaint ("FAC"): (1) discriminatory termination in violation of Title VII–Religion

18   (Count Two); (2) discriminatory termination in violation of the ADEA (Count Three); and

19   (3) retaliation in violation of Title VII and the ADEA (Count Five).[1]  The motion is fully

20   briefed.  (Docs. 67, 74.)  For the reasons below, the Court grants the motion, in part, and

21   denies it, in part.

22   **I.    Factual Background**

23          KRMC is a non-profit regional trauma center based in Kingman, Arizona.  (DSOF

24   ¶ 1.)[2]  Plaintiff is an ear, nose and throat physician and surgeon ("ENT").  (PSSOF ¶ 1.)

25   _____

26   [1]  These are the only remaining claims in the FAC.  (*See* Doc. 60; citations to the FAC are
     to Doc. 1 at 6-15)

27   [2]  Citations to "DSOF" are to Defendant's statement of facts in support of its motion for
     summary judgment.  (Doc. 57.)  Citations to "PCSOF" are to Plaintiff's controverting
28   statements of facts.  (Doc. 68 at 1-28.)  Citations to PSSOF are to Plaintiff's supplemental
     statement of facts.  (*Id*. at 28-63.)

On November 1, 2008, Plaintiff entered into a three-year employment contract with KRMC (the "first agreement"). (DSOF ¶ 2.) Plaintiff's base salary was $434,693 and was later increased to $550,000, with a bonus based on revenue generated from physician-related services. (PSSOF ¶¶ 5-6; Ramirez Decl., Ex. 1.)[3]

During September 2012, Plaintiff and KRMC began discussing a new employment contract. (PSSOF ¶ 48.) On July 31, 2013, Plaintiff entered into a new three-year contract ("Agreement") with KRMC. (DSOF ¶ 3; PSSOF ¶ 50.) Plaintiff's base salary remained $550,000. (DSOF ¶ 3, PSSOF ¶¶ 57-60.) Schedule A of the Agreement provided for a potential bonus based on Plaintiff's work relative value units ("RVUs"). (DSOF ¶ 3; PSSOF ¶¶ 70-72.) Schedule A of the Agreement also provided that if Plaintiff's total RVUs in any given fiscal year were less than the 7,500 RVUs required to cover Plaintiff's base salary, his base salary would "be reduced by an amount proportionate to the deficit in work RVUs required to cover" his base salary and the RVUs produced. (DSOF ¶ 3, DSOF, Ex. 21; PCSOF ¶ 3.)

Plaintiff asserts that when he signed the Agreement he thought that his bonus remained a "collections bonus" that was based on revenues from all physician-related services, as it had been in Schedule A of the first agreement. (PSSOF ¶ 60.) Plaintiff alleges that at the time he signed the Agreement, Tim Blanchard, KRMC's CFO, did not tell him that the first agreement's "Schedule A" collections bonus had been replaced by a new "Schedule A" that was attached only to the signed original Agreement that Blanchard kept for his file. (*Id*. at ¶ 62.) Plaintiff alleges that he would not have signed the Agreement if he had been told about the new Schedule A. (*Id*. at ¶¶ 67-69.) Plaintiff asserts that Schedule A was not attached to the signed original of the Agreement that he was provided. (PSSOF ¶ 62.) Plaintiff asserts that he did not notice that Schedule A was missing from his copy of the Agreement because Blanchard had not mentioned the change to the bonus structure during their negotiations. (*Id.* at ¶¶ 61-75). During his deposition, Blanchard

---

[3] The Ramirez Declaration ("Ramirez Decl.") is filed at docket 79. (*See* Doc. 78 (granting Plaintiff's motion to file a substitute declaration).) The exhibits are filed at Doc. 68-1.

stated that he does "not recall" telling Plaintiff about the new Schedule A. (*Id*. at ¶ 64; Blanchard Depo. at 25.)[4]

Plaintiff alleges that KRMC is a "Mormon-run" hospital that is controlled by CEO Brian Turney, a Mormon.[5] (PSSOF ¶¶ 170-94.) Plaintiff alleges that his immediate supervisor, Stacy McDaniel (now Stacy Merritt), also had "deep ties to the Kingman area Mormon Church and community." (*Id*. at ¶¶ 172-74.) Plaintiff alleges that Turney and Merritt cultivated a "Mormon Mafia" culture and power structure that favored Mormons over non-Mormons. (*Id*. at ¶¶ 175-84.) Plaintiff asserts that he is Christian and that he regularly complained to Merritt about the Mormon culture and power structure. (*Id*. at ¶¶ 183-84.)

Defendant states that in January 2014, Blanchard and Merritt, who was then Director of Surgical Specialties, decided to terminate Plaintiff's employment based on Plaintiff's poor job performance and bad attitude. (DSOF ¶ 4.) Blanchard and Merritt informed Turney of their decision to terminate Plaintiff's employment, and Turney supported that decision. (DSOF ¶ 5; PSSOF ¶¶ 99-109.) On January 31, 2014, KRMC terminated Plaintiff's employment pursuant to the "without cause" clause of the Agreement. (DSOF ¶ 6.) Plaintiff was the only physician terminated for "performance reasons" between January 1, 2013 and December 31, 2014. (PSSOF ¶ 117; Turney Depo. at 112.)

Plaintiff alleges that he was "blindsided" by his termination because he had not been warned, disciplined, or informed that any serious issues related to performance or other issues might put his job at risk. (PSSOF ¶¶ 17, 90, 108; Turney Depo. at 102, 105, 114, 162-63; Blanchard Depo. at 33-35, 42, 64-65; Merritt Depo. at 31-22; *but see* Merritt Depo. at 37.) Plaintiff asserts that Defendant has a policy of documenting disciplinary or important meetings with physicians. (PSSOF ¶ 18; Turney Depo. at 104-05; Blanchard

---

[4] The Turney, Blanchard, and Merritt depositions are filed at DSOF (Doc. 57), Exs. 2, 3, and 4, respectively.

[5] Plaintiff refers to members of the Church of Jesus Christ of Latter-day Saints by the colloquial term "Mormons."

Depo. at 34; *but see* Merritt Depo. at 32-33.) Turney testified the he deferred to KRMC's human resources officer on the issue of KRMC's policy, but that his "recollection of the policy" was that anything "disciplinary in nature" "should be documented and kept on file." (Turney Depo. at 104.)

Turney stated that he had discussions with Plaintiff about his productivity, but he was not aware of any written warning that had been issued to Plaintiff. (*Id.* at 105.) Blanchard testified that KRMC had a policy of documenting conversations with doctors about "employment problems." (Blanchard Depo. at 34.) Blanchard testified that he talked to Plaintiff about his RVUs and told Plaintiff that his productivity needed to increase to match his compensation, but Blanchard stated that he did not tell Plaintiff that there would be any "consequences" or that Plaintiff "was subject to termination if he did not improve his RVUs." (Blanchard Depo. at 36, 63-65.) Blanchard stated that he did not document his meetings with Plaintiff. (*Id.* at 34, 63-64.) Blanchard stated that, other than Plaintiff's productivity, he did not discuss any issues with Plaintiff before his termination. (*Id.* at 65.) Merritt testified that she was unaware of a KRMC policy that required documentation of meetings with physicians regarding performance or disciplinary matters. (Merritt Depo. at 33.)

Plaintiff, who was 60 years old in October 2013, alleges that KRMC hired Dr. Bernadette Braze, a much younger physician, to replace him. (PSSOF ¶¶ 1, 77-85.) Dr. Braze was between 42 and 45 years old when she was hired. (DSOF ¶ 85, PSSOF, Ex. G.) Dr. Braze began working at KRMC in December 2013. (Ramirez Decl. ¶ 52.) Plaintiff alleges that KRMC stated that Dr. Braze was hired to help with his clinical patient workload, but she did not help and instead used "his office equipment and staff and otherwise ignored him." (*Id.*) During proceedings before the EEOC, KRMC initially stated that Dr. Braze was hired to replace Plaintiff. (PSSOF ¶¶ 81, 83; PSSOF, EX. G.) In a subsequent letter to the EEOC, KRMC stated that because Plaintiff was not terminated until 2014 (effective March 31, 2014), Dr. Braze, who was hired in 2013, was not hired to replace him. (PSSOF, Ex. H.) KRMC states that it has not hired an ENT doctor to replace

Plaintiff. (*Id*.) As set forth below, Defendant provides several reasons for terminating Plaintiff, which the parties dispute. (Doc. 56 at 2.)

### A. Defendant's Stated Reasons for Terminating Plaintiff's Employment

### 1. Plaintiff's Productivity

Defendant asserts that in 2013, based on a "pool of data of similarly situated ENT doctors in similar practices from the Medical Group Management Association (MGMA)," Blanchard discovered that Plaintiff generated less revenue than most doctors in the pool. (DSOF ¶¶ 9, 10.) Based on a review of KRMC's physician's RVUs, Blanchard discovered that Plaintiff's productivity fell beneath his compensation level. (DSOF ¶ 8.) Plaintiff alleges that Blanchard had no reason to scrutinize his productivity and had not done so in the past. (PSSOF ¶¶ 20-22.) Plaintiff asserts that Blanchard did not tell him that he was compiling this data to compare it to Plaintiff's RVU numbers and salary. (PSSOF ¶¶ 32-37, 42-47.)

Defendant asserts that starting in late 2012 Blanchard and Plaintiff "met multiple times to discuss his productivity." (DSOF ¶ 11.) In his deposition, Plaintiff admits that during two meetings in late 2013 Blanchard informed him that his salary needed to be reduced, but Plaintiff refused to accept a reduction in his pay. (DSOF ¶ 12; Ramirez Depo. at 277-78.)[6] Blanchard testified that he talked to Plaintiff about his RVUs and told Plaintiff that his productivity needed to increase to match his compensation, but Blanchard did not tell Plaintiff that there would be any "consequences" or that Plaintiff "was subject to termination if he did not improve his RVUs." (Blanchard Depo. at 36, 63-65.)

### 2. Plaintiff's Use of Operating Room Block Time

Defendant asserts that in December 2013 it learned that more than twenty percent of the time Plaintiff was starting late in his morning operating room ("OR") block time. (DSOF ¶ 15; DSOF, Exs. 23, 29.) KRMC revoked Ramirez's morning block time. (DSOF ¶ 15.) Plaintiff denies this assertion and asserts that KRMC falsely stated that he referred

---

[6] The Ramirez deposition is filed at DSOF, Ex. 1.

to himself as a "chronic late starter." (PSOF ¶ 15; PSSOF ¶ 168.) Plaintiff, however, does not offer any evidence disputing that he started late in his OR block time.

### 3. Plaintiff's Resistance to KRMC's Implementation of Electronic Medical Records

By January 1, 2014, KRMC was required to meet a federal mandate that required medical institutions and physicians to use electronic medical records ("EMR") or incur financial penalties. (DSOF ¶ 16; PCSOF ¶ 16.) KRMC implemented an EMR system called NextGEN. (DSOF ¶ 17; PCSOF ¶ 17.) Defendant asserts that it terminated Plaintiff because of his resistance to KRMC's implementation of EMR. (Doc. 56 at 2; Turney Depo. at 146; Merritt Depo. at 37-39; Ex. I.) In a June 2012 email to Merritt, Plaintiff stated that it was after 6:00 p.m., but he still had several hours of charting to complete. (DOSF, Ex. 8.) Plaintiff stated that "my contract needs to be renegotiated considering I will be working 12 hours continuously." (*Id.*; *see* Ramirez Depo. at 223-25 (agreeing that physicians should be paid for time spent using NextGEN).)

Plaintiff admits that he was critical of NextGEN based on his belief that it was inefficient. (PSSOF ¶¶ 127, 130-36.) In his deposition, Turney testified that NextGEN was difficult to implement and to use and negatively impacted physicians' productivity. (Turney Depo. at 146, 149.) KRMC approved Plaintiff's use of Dragon Medical, a scribe and voice-recognition software and provided him with a home computer to assist with implementation of NextGEN. (DSOF ¶ 19; PCSOF ¶ 19.) Other physicians reported difficulty using NextGEN. (Turney Depo. at 146; Merritt Depo. at 38 (stating that she thought the "majority of doctors" did not like using EMR).) KRMC permitted physicians to use a hybrid system of NextGEN and paper charts. (Turney Depo. at 146-47; Ramirez Decl. ¶ 68.) Plaintiff asserts that he did not think that the use of NextGEN was mandatory based on KRMC's approval of a hybrid EMR and paper chart system that it permitted Plaintiff and other physicians to use. (PCSOF ¶¶ 17; PSSOF ¶¶ 119-38.)

Defendant asserts that in an email to the Chief Medical Officer, Plaintiff stated that he would not use NextGEN. (DSOF ¶ 20.) Plaintiff disputes that assertion. (PCSOF ¶ 20;

DSOF, Ex. 8 (August 31, 2012 email).) However, in an August 31, 2012 email to Merritt and several other physicians, Plaintiff wrote that NextGEN "ha[s] to go!" (DSOF, Ex. 8.) Plaintiff described the inefficiencies of using NextGEN and wrote that he would "NOT WORK ON NEXTGEN EVER AGAIN." (*Id.*) Later in 2012, Plaintiff and other physicians went to Tucson to observe the Arizona Community Surgeons use of the NextGEN system. (PSSOF ¶¶ 127-28.) In a November 27, 2012 email, Plaintiff suggested to Turney that KRMC purchase the newer version of NextGEN that he had observed in Tucson. (PSSOF ¶¶ 128-27; Turney Depo. at 150-51, 154.)

In a May 2013 email, Plaintiff stated that NextGEN was inefficient and suggested that KRMC bring in Gabriel Choza, "a proven leader at Tucson Surgical," to help them optimize NextGEN, which Plaintiff stated was created for primary care doctors, not for surgeons. (DSOF, Ex. 8.) In response, Dr. Jeffrey Lynn stated that he appreciated Plaintiff's perspective, but that NextGEN was approved by the "highest levels" and that KRMC needed a solution that was good for the aggregate. (*Id.*) He noted that some physicians had refused to use NextGEN but stated "that will not continue." (*Id.*)

Defendant asserts that Plaintiff's use of the "hybrid system" and his refusal to use NexGen, and his attitude about using NextGEN, were among the reasons for terminating Plaintiff. (Turney Depo. at 154; Blanchard Depo. at 68-69; Merritt Depo. at 39.) At the time of Plaintiff's termination in January 2014, other KRMC physicians were still using the hybrid system and as of 2018 there was not "100 percent" usage of NextGEN. (PSSOF ¶ 136-36; Kjelgaard Depo. at ¶¶ 59-60, 142; Merritt Depo. at 39.)

### 4.    Plaintiff's Use of Tylenol with Codeine for Pediatric Patients

Defendant stated that another reason for Plaintiff's termination was his refusal to stop prescribing Tylenol with Codeine after the June 2013 death of pediatric patient, M.G., following a tonsillectomy that Plaintiff performed. (DSOF ¶ 22; PSSOF ¶¶ 150-67.) On May 5, 2014, M.G.'s parents and his estate sued KRMC and its physicians, including Plaintiff, for wrongful death and medical negligence (the "M.G. Lawsuit"). (DSOF ¶ 23;

PCSOF ¶ 23.)  It was alleged that M.G.'s death resulted, in part, from Plaintiff's decision to prescribe Tylenol with Codeine to him after his surgery.  (DSOF ¶ 23.)

Plaintiff states that, "as was his usual practice," he had prescribed Tylenol 3 with codeine for pain.  (PSSOF ¶ 152.)  The use of Tylenol with Codeine was contrary to the FDA's black box warning in effect at the time, which warned against administering it to pediatric patients post-surgery ("Box Warning").  (DSOF ¶ 24, PCSOF ¶ 24.)  At the time of M.G.'s death, Plaintiff did not know about the Box Warning, which the FDA sends out by mail because he did not open his mail.  (DSOF ¶ 26; PSSOF ¶ 157; Ramirez Decl. ¶ 87; Ramirez Depo. at 143-44.)

Plaintiff admits he became aware of the Box Warning after M.G. died.  (DSOF ¶ 26; PCSOF ¶ 26; Ramirez Depo. at 143-45, 265-66.)  During his deposition, Plaintiff testified that after M.G.'s death, he prescribed Tylenol with Codeine "a few times" but after he read the Box Warning he started prescribing Lortab instead.  (Ramirez Depo. at 144, 147-48.) Plaintiff later explained that he had prescribed Tylenol with Codeine for twenty-five years without a problem and he thinks that after M.G.'s death he prescribed Tylenol with Codeine to a "handful of patients" and then switched to Lortab "eventually when [he] read the Black Box Warning."  (*Id.* at 147-48.)

Defendant asserts that Plaintiff's medical assistant ("MA"), Melissa Kjelgaard, who was responsible for calling in prescriptions for surgery patients, testified during her deposition that Plaintiff continued to prescribe Tylenol with Codeine to pediatric patients until his termination from KRMC in 2014.  (DSOF ¶ 28; Kjelgaard Depo. at 89, 90, 102-03.)  Plaintiff disagrees with this characterization of her testimony.  (PCSOF ¶ 28.) However, the record reflects that Kjelgaard testified that she called in the prescriptions for M.G.  (Kjelgaard Depo. at 89, 90.)  She also testified that "after M.G.," Plaintiff "usually stuck with Tylenol with Codeine or Lortab . . . until he left."  (*Id.* at 102-03.)

Defendant asserts that on December 20, 2013, KRMC asked Plaintiff to provide his standard post-op orders for pediatric patients and that, in response, Plaintiff confirmed that he "used Tylenol with Codeine for moderate pain" in his pediatric post-op orders.  (DSOF

¶ 29; DSOF, Exs. 28, 30.)  Plaintiff disputes this assertion and states that the referenced email, DSOF, Ex. 28, does not support it.  (DSOF ¶ 29.)  However, in response to a January 3, 2014 email that asked Plaintiff to indicate his pediatric post-op procedure, Plaintiff stated that he used "Tylenol with Codeine for moderate pain."  (DSOF, Ex. 28.)

Defendant asserts that Blanchard's notes from Plaintiff's January 31, 2014 termination meeting reflect that, at that meeting, Plaintiff "stated he would continue to prescribe [Tylenol with Codeine] to children."  (DSOF ¶ 30; DSOF, Ex. 32.)  Plaintiff denies this assertion and the "authenticity" of Blanchard's purported notes.  (DSOF ¶ 30.) During his deposition, Plaintiff stated that he did not recall telling anyone that he would continue prescribing Tylenol with Codeine for pediatric patients.  (DSOF ¶ 31; PCSOF ¶ 31; Ramirez Depo. at 144-45.)

### 5.    Plaintiff's Failure to Respond to ER while On-Call

KRMC is subject to the Emergency Medical Treatment and Active Labor Act ("EMTALA"), which creates liability if a physician fails or declines to respond to a call from a hospital's emergency department.  (Doc. 56 at 5.)  On December 4, 2013, Plaintiff was listed as the ENT on-call for the emergency room ("ER").  When the ER received a patient who needed ENT services, it called Plaintiff repeatedly without response.  (DSOF ¶ 37; PCSOF ¶ 37.)  Plaintiff eventually notified KRMC that he was in New York.  (*Id.*) Plaintiff does not dispute he was listed on-call that day, or that he was unavailable to take the call.  (*Id.*)

Rather, Plaintiff asserts that in November 2013 he made plans to attend a medical conference in New York City and that, a week before the conference, he told KRMC's on-call scheduler, Suzie Frisbie, not to schedule him for on-call duty during the dates of the conference.  (PSSOF ¶ 142.)  Plaintiff asserts that Frisbie mistakenly put him on the on-call schedule.  (*Id.* at 143; Kjelgaard Depo. at 86-89; Ramirez Decl. ¶ 78; Ramirez Decl., Ex. 4.)  Consistent with that assertion, during his deposition, Plaintiff asserted that staff failed to notify the ER that he was unavailable on the assigned on-call date.  (Ramirez Depo. at 362-63.)  In a November 2, 2014 letter, Frisbie stated that on December 2, 2013,

Plaintiff informed staff members that his airline itinerary for his trip to New York had changed and asked them to reschedule the afternoon of December 4, 2013. (Ramirez Decl., Ex. 4.)

## B. The EEOC Charge

On September 21, 2014, Plaintiff filed with the Equal Employment Opportunity Commission ("EEOC") a charge of discrimination alleging discrimination based on religion, age, and national origin (the "EEOC Charge"). (PSSOF, Ex. J.)

## C. The M.G. Lawsuit Settlement and the Medical Board Inquiry

The M.G. Lawsuit settled in November 2015. Plaintiff objected to the settlement. (DSOF ¶ 32.) Plaintiff states that only one physician who had been sued, Dr. Burton, was allowed to "get out of the case before it was dismissed." (PSSOF ¶¶ 198-99.) Plaintiff states that he requested the same courtesy. (*Id*. at ¶ 200.) Once a settlement was reached, federal law obligated KRMC to report Plaintiff to the National Practitioner Data Bank ("NPDB") for monies paid and attributed to him. (DSOF ¶ 33.) This report led to an Arizona Medical Board ("AMB") inquiry, which required Plaintiff's participation. Plaintiff ultimately consented to the entry of an order by the AMB finding that Plaintiff engaged in "unprofessional conduct when he departed from the standard of practice in his care and treatment of [M.G.]" by failing to admit M.G. overnight and by treating M.G. with Tylenol with Codeine. (DSOF ¶ 36.) The AMB placed Plaintiff on probation for six months. (*Id*.) Plaintiff asserts that KRMC settle the M.G. Lawsuit to retaliate against him for filing the EEOC charge in September 2014. (Doc. 67 at 10-11.)

## II. Summary Judgment Standard

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  Conclusory allegations contained in the pleadings, which are unsupported by factual evidence, are insufficient to defeat a motion for summary judgment. *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1237 (9th Cir. 1998).  Similarly, an affidavit that recites conclusory allegations will not defeat summary judgment.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990); *see also Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995) (while plaintiff's burden at the summary judgment stage is not overly burdensome, plaintiff cannot merely rely on generalizations).  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court considers Defendant's motion for summary judgment under these standards.

## III.    Count Two—Title VII Claims

Title VII of the Civil Rights Act of 1964, as amended, prohibits two categories of employment practices.  It is unlawful for an employer:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).  "These proscriptions often referred to as the 'disparate treatment' (or 'intentional discrimination') provision and the 'disparate impact' provision, are the only causes of action under Title VII." *EEOC v. Abercrombie & Fitch Stores, Inc.*, ___ U.S. ___, 135 S. Ct. 2028, 2032.  (2015).

In Count Two, Plaintiff alleges that Defendant violated Title VII by terminating him based on his religion.  (FAC ¶¶ 51-56.)  Specifically, Plaintiff asserts a claim of reverse-

discrimination by alleging that Defendant terminated him because he was a non-Mormon and, therefore, was not a member of the same religion as those in charge at KRMC.  (*Id.*)  Plaintiff alleges that Defendant treated similarly situated employees more favorably by permitting them to use Defendant's previous health records program while terminating Plaintiff "for not using the new electronic health record system properly."  (*Id.* at ¶ 53.)  Plaintiff also asserts that Defendant's policies had a discriminatory impact on non-Mormons, including Plaintiff.  (*Id.* at ¶ 54.)  Thus, Plaintiff alleges a disparate treatment claim and a disparate impact claim.  Defendant moves for summary judgment on Plaintiff's Title VII claims asserted in Count Two.  (Doc. 56.)  As set forth below, the Court grants Defendant's motion for summary judgment on both claims asserted in Count Two.

### A.  *McDonnell Douglas* Burden-Shifting Analysis

The parties agree that, at the summary judgment stage, Plaintiff's Title VII claims are subject to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  (FAC at ¶¶ 51-56; Doc. 56 at 5; Doc. 67 at 12.)  Under this burden-shifting framework, Plaintiff must first establish a prima facie case of discrimination.  Defendant asserts that the Court should analyze Plaintiff's prima facie case of a reverse discrimination claim under the framework the Tenth Circuit set forth in *Shapolia v. Los Alamos Nat'l. Lab.*, 992 F.2d 1033 (10th Cir. 1993), and the Ninth Circuit recognized in *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168-69 (9th Cir. 2007).  (Doc. 56 at 6.)  Plaintiff does not dispute that assertion.  (Doc. 67 at 12-14.)

In *Noyes*, the Ninth Circuit noted that it had not previously articulated the prima facie showing applicable to a claim of reverse religious discrimination.  *Noyes*, 488 F.3d at 1168.  The court found *Shapolia* instructive on the "protected class" element required in traditional claims of discrimination, but found that element did not apply to a "non-adherence or reverse religious discrimination claim because 'it is the religious beliefs of the employer, and the fact that [the employee] does not share them, that constitutes the basis of the [religious discrimination] claim.'"  *Noyes*, 488 F.3d at 1168-69 (quoting *Shapolia*, 992 F.2d at 1038) (alterations in original).  Instead, the court recognized that it

is appropriate to tailor the elements of the prima facie case according to the circumstances of each case. *Noyes*, 488 F.3d at 1169. In *Shapolia*, the court replaced the "protected class" element with an "additional evidence" element. *Shapolia*, 992 F.2d at 1038. Considering the Ninth Circuit's decision in *Noyes*, the Court finds that the prima facie case articulated in *Shapolia* is appropriate to the circumstance of this case.

Thus, to make a prima facie showing of discrimination based on Plaintiff's failure to adhere to his employer's religious beliefs, Plaintiff must show: (1) that he was subjected to an adverse employment action; (2) at the time the employment action was taken, his job performance was satisfactory; and (3) some additional evidence to support the inference that the employment action was taken because of a discriminatory motive based upon the employee's failure to hold or follow his employer's religious beliefs. *Shapolia*, 992 F.2d at 1038; *see Noyes*, 488 F.3d at 1069; *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004) (stating that to make a prima facie showing of discrimination based on religion a plaintiff must show, among other factors, that "similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination.") Although the burden at the prima facie stage is "not onerous," a plaintiff must still produce some evidence to meet his burden. *Lyons v. England*, 307 F.3d 1092, 1112-13 (9th Cir. 2002).

If Plaintiff makes that prima facie showing, the burden of production then shifts to Defendant "to articulate a legitimate, nondiscriminatory reason for its adverse employment action." *Noyes*, 488 F.3d at 1169. If Defendant satisfies its burden to articulate a nondiscriminatory reason for the adverse employment action, the burden shifts back to Plaintiff "to come forward with evidence that the proffered reasons were a pretext for discrimination." *Id*. The Ninth Circuit has emphasized "the shift back to the plaintiff does not place a new burden of production on the plaintiff." *Id*. The jury may infer the ultimate fact of intentional discrimination from the evidence presented in the prima facie case "if the factfinder rejects the employer's proffered nondiscriminatory reasons as unbelievable." *Id*. at 1169-70. A plaintiff can prove pretext indirectly "by showing the employer's

proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable," or directly by showing unlawful discrimination more likely motivated the employer. *Id*. at 1170. The court considers the evidence of pretext cumulatively and "in the context of Title VII claims, the burden on plaintiffs to raise a triable issue of fact as to pretext is hardly an onerous one." *Id*.

### B.    Disparate Treatment Claim

To establish a prima facie case for his disparate treatment claim, Plaintiff must show an adverse employment action, satisfactory job performance at the time of that action, and some additional evidence to support the inference that the employment action was taken because of a discriminatory motive based upon his failure to hold or follow his employer's religious beliefs. *Shapolia*, 992 F.2d at 1038. The parties do not dispute that Plaintiff's termination is an adverse employment action. Thus, Plaintiff has established the first element of his prima facie case for his claim.

Additionally, on the second element, Plaintiff presented enough evidence to create a genuine dispute regarding whether his job performance was satisfactory at the time of his termination. As set forth above in Section I.A, Defendant asserts that Plaintiff's job performance was unsatisfactory because Plaintiff's productivity fell below his compensation level, he started late for his morning OR block time, he resisted or had a bad attitude about NextGEN, he continued to prescribe Tylenol with Codeine to pediatric patients after the 2013 death of a pediatric patient, and he was unavailable when he was "on call" in December 2013. *See* Section I.A.1-5. However, there are genuine disputed issues of fact on at least some of these asserted areas of job performance.

For example, while Plaintiff admits that he used a hybrid system of NextGEN and paper charts, Defendant admits that it permitted physicians to use that system. (Turney Depo. at 146-47; Ramirez Decl. ¶ 68; *see* Section I.A.3.) Additionally, there is evidence that at the time of Plaintiff's termination in January 2014, other KRMC physicians were still using the hybrid system and, as of 2018, the usage of NextGEN was not "100 percent." (Kjelgaard Depo. at 59-60, 142; Merritt Depo. at 39.) Additionally, the evidence regarding

Plaintiff's continued prescription of Tylenol with Codeine is disputed. During his deposition, Plaintiff testified that he continued to prescribe Tylenol with Codeine to pediatric patients "a few times" after the death of the pediatric patient, but other evidence indicates that Plaintiff continued to prescribe that medication until he was terminated in 2014. *See* Section I.A.4. Additionally, although Plaintiff admits he was unavailable when he was on-call on December 4, 2013, he provided a reasonable explanation for his unavailability that is supported by other evidence in the record. *See* Section I.A.5.

For the third element of his prima facie case of disparate treatment claim, Plaintiff must present some additional evidence to support the inference that the employment actions were taken because of a discriminatory motive based upon his failure to hold or follow his employer's religious beliefs. *Shapolia*, 992 F.2d at 1038. Plaintiff presents several different categories of evidence related to issue of discriminatory motive.[7] (Doc. 67 at 7, 14-15.) The Court discusses this evidence below. Although the Court separates the categories of evidence in the interest of clarity, the Court considers the evidence cumulatively.

### 1. Plaintiff did not the Share Religious Beliefs of his Employers

Plaintiff, who identifies himself as Christian, asserts that KRMC is a Mormon-run hospital. (Doc. 67 at 7.) It is undisputed that the CEO Turney is Mormon and has connections to the Mormon community. (PSSOF ¶¶ 170-94; DSOF ¶ 49; Turney Depo. at 29-37.) The majority of the KRMC board of directors is Mormon. (Turney Depo. at 28.) Defendant states that in January 2014 Blanchard and Merritt decided to terminate Plaintiff. (DSOF ¶¶ 4, 5.) Merritt is Mormon, but Blanchard is not. (DSOF ¶¶ 4, 54, 55; PCSOF ¶¶ 53, 54.) In his deposition, Turney testified that the decision to terminate Plaintiff was a "group decision," and he "supported the decision." (Turney Depo. at 46-47, 66; Blanchard Depo. at 88-89.) Considering the role of Turney and Merritt in the decision to terminate Plaintiff, there is undisputed evidence that Plaintiff did not share the religious beliefs held by some individuals involved in the decision to terminate him.

---

[7] Plaintiff relies on the same evidence to support his prima facie case and to argue pretext. (Doc. 67 at 12-13.)

## 2. Mormon Culture and Favoritism at KRMC

Plaintiff asserts that he was terminated because he was a "disfavored non-Mormon." (PSSOF at ¶ 194.) However, Plaintiff admits that no one at KRMC asked him about his own religion, including during the "onboarding or recruiting process." (DSOF ¶ 55; PCSOF 55.) As evidence that his termination was motivated by his failure to share the religious beliefs of his employer, Plaintiff argues that Turney and "like-minded Mormons regularly socialize," know which employees at KRMC are Mormon and which are not, and favor Mormons. (Doc. 67 at 7; PSSOF ¶¶ 175-84 (citing Ramirez Decl. ¶¶ 97-98, 100; Turney Depo. at 28-29, 121-22, 174; Merritt Depo. at 16-19, 22-23; Kjelgaard Depo. at 118-19, 134-36, 145-56).) Plaintiff also asserts that he complained about the "Mormon culture and power structure" at KRMC to his supervisor Merritt and that Turney knew of his complaints. (PSSOF at ¶¶ 183-84 (citing Ramirez Decl. ¶ 101; Merritt Depo. at 16-19; Turney Depo. at 174).)

During his deposition, Turney stated that "over time" he could "figure . . . out who was Mormon." (Turney Depo. at 29-30, 32, 33.) Turney stated that he had not heard from any KRMC employee that there was a perception that Mormons were favored over non-Mormons, but he would not have been shocked if someone said that because people said "a lot of things." (*Id*. at 121-22.) Turney also stated that, since Plaintiff's termination, he had heard "chatter" that KRMC employees thought Mormons were in "power," and that he was aware that Plaintiff had "made a couple of comments before he left," but did not know Plaintiff had that "degree of animus toward" Mormons. (*Id*. at 173-74.)

During her deposition, Merritt testified that she had heard Plaintiff use the term "Mormon mafia," and that he complained about the hospital being run by Mormons. (Merritt Depo. at 16-17.) Merritt testified that she and Turney talked about church activities, such as choir practice, at work. (*Id*. at 21-22.) Merritt stated that her conversations about her faith with Plaintiff consisted of him asking about who the Mormons were at KRMC. (*Id*. at 24.)

As Plaintiff notes, Kjelgaard testified at her deposition that she understood Plaintiff's lawsuit to be claiming that a majority of KRMC administrators and staff have religious beliefs not shared by Plaintiff and that "people seem to move further up the chain if they know admin and have that group [Mormons]." (Kjelgaard Depo. at 118-19, 134-35.) She did not, however, describe any instance of favoritism toward a Mormon employee. (*Id*. at 118-119, 136-37.) Kjelgaard, who identified herself as Catholic, testified that she did not recall being asked about religion at work. (*Id*. at 119-20.) She stated that KRMC employees talked about their religion in the context of their children's or family's activities. (*Id*. at 120.) Kjelgaard stated that no administrators or doctors talked to her about religion. (*Id*.) She testified that she had heard rumors that there were a lot of Mormons in the KRMC administration. (*Id*. at 136, 147.) She also testified that she had heard the term "Mormon mafia" "around the community" and that it was common knowledge in the Kingman area that "Mormons run KRMC." (*Id*. at 137, 139, 145, 148.) Kjelgaard testified that she did not discuss religion, "Mormon culture," or the "Mormon mafia" at KRMC because she wanted to "make sure nobody was upset and/or felt it was necessary to be upset with her and possibly . . . risk [her] job." (*Id*. at 146.) She also testified that she had no reason to believe that her faith or religion would negatively impact her job, and that she avoided conversations about faith or religion because she felt people should not be judged based on that issue. (*Id*. at 120, 147-47.)

To support his allegations of favoritism, Plaintiff asserts that KRMC allowed Mormon physicians (Drs. Knievel, Taylor, Oldham, and Oldham's partner) to use paper charts after KRMC transitioned to the NextGEN/EMR system. (DSOF ¶ 60; PCSOF ¶ 60.) Plaintiff admits that this allegation is not based on his first-hand knowledge or information from KRMC management but is based on what Kjelgaard told him. (DSOF ¶ 63; PCSOF ¶ 63.) Plaintiff admits that he did not "do anything to verify whether or not [the] doctors were indeed permitted to continue to use the paper charting," and does not know for how long the doctors were allowed to use paper charts, or if the doctors used the paper charts as part of a hybrid system, like the hybrid system KRMC permitted Plaintiff to use.

(DSOF ¶ 64; PCSOF ¶ 64.)  Additionally, Plaintiff admits that KRMC permitted him to use a hybrid system of paper charting and EMR after the implementation of NextGEN. PCSOF ¶ 62.)

The evidence that Plaintiff cites to support his claims of Mormon culture and favoritism at KRMC, and his complaints about those issues, is insufficient to create a genuine issue of disputed fact on the third element of the prima facie—whether Plaintiff has presented some evidence to support an inference that Defendant terminated him because he did not share his employer's religious beliefs.  *But see Fischer v. Forestwood Co.*, 525 F.3d 972, 986 (10th Cir. 2008) (concluding that the district court erred in failing to find that plaintiff established a prima facie case of failure to hire when there was evidence that plaintiff sought reinstatement directly from the president of the company, the president was aware that plaintiff was not a member of the FLDS church and that since at least 1999 the company had not hired or interviewed anyone who was not a member of the FLDS church); *Sattar v. Motorola, Inc.,* 138 F.3d 1164, 1167, 1170 (7th Cir. 1998) (finding sufficient evidence to raise an inference that plaintiff's discharge was based on an impermissible reason when the record was "replete with examples" of the plaintiff's supervisor "hound[ing]" him about his religion including advising him to follow the Koran, inviting him to weekly prayer sessions in the supervisor's office, sending the plaintiff hundreds of emails with citations to the Koran and dire warnings about punishments to those who turned their back on Islam, and telling the plaintiff that his standing with his superiors would improve if he returned to Islam); *Scott v. Montgomery Cty Sch. Bd.*, 963 F. Supp. 2d 544, 548, 556 (W.D. Va. Aug. 5, 2013) (finding a genuine dispute on the issue of motive when the plaintiff offered undisputed evidence that she did not join a bible study group or attend a religious group when asked by her immediate supervisor, told her immediate supervisor she was not comfortable starting each work day with a prayer or devotional, her immediate supervisor knew she was not comfortable with the overtures but left religious materials in the plaintiff's work area, during an evaluation plaintiff's

supervisor said she felt a "righteous anger toward" plaintiff, and plaintiff's immediate supervisor participated in the termination decision).

There is evidence that Turney and Merritt discussed activities related to their church at work, such as choir practice, but there is no evidence Plaintiff was asked about his religion or asked to participate in any religious activities. There is evidence that there were rumors in Kingman that KRMC was run by Mormons, and that Kjelgaard avoided discussing religion because she did not want to "possibly . . . risk her job," or because she felt people should not be judge on that issue (Kjelgaard Depo. at 120, 146-47), but she also stated that she had no reason to believe that her faith or religion would negatively impact her job. (*Id*. at 146-47.) Additionally, Plaintiff claims that he complained to his supervisor Merritt about the Mormon culture and power structure, but he does not provide any details about those complaints. Similarly, Merritt testified that Plaintiff complained, but did not provide any specifics. Turney testified that he was aware that Plaintiff had "made a couple of comments before he left," but did not know Plaintiff had "the degree of animus toward" Mormons. (Turney Depo. at 173-74.) The Court concludes that this evidence does not create a genuine dispute on the issue on motive.

### 3. Biased Comment at September 2012 Medical Staff Meeting

Plaintiff alleges that during a September 2012 medical staff meeting, he heard Turney tell another administrator, Larry Lewis, "we are hiring two more Mormons, and I don't care what anyone thinks. If I had my way I would hire all Mormons." ("September 2012 comment"). (PSSOF ¶ 180; Ramirez Decl. ¶ 100.) Plaintiff claims that this comment referred to the non-Mormon physicians whose contracts were terminated and replaced by Mormon physicians. (PSSOF ¶¶ 192-93.) In his deposition, Turney denied making the September 2012 comment. (Turney Depo. at 34-35.)

Thus, Plaintiff asserts that Turney made one comment that exhibited his bias against individuals who were not Mormon. However, Plaintiff admitted in his deposition that this comment was not directed to, or about, Plaintiff. (Doc. 74 at 5; DSOF; Ex. 1, Ramirez Depo. at 164-65.) Isolated remarks, unrelated to the disputed employment action, are

insufficient to demonstrate discriminatory animus.  *See Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (comment uttered in an ambivalent manner and not tied to employee's termination was insufficient to create an inference of age discrimination); *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir. 1990) (stray comments unrelated to the decisional process were not sufficient to raise triable issues concerning the discriminatory nature of a discharge).  Plaintiff alleges that the September 2012 comment was made at the beginning of a "set up" that led to his termination in 2014.  (Doc. 67 at 3.) However, nothing in the record ties the September 2012 comment to the decision to terminate Plaintiff.

Therefore, considering the evidence related to the third element of the prima facie case, the Court concludes that Plaintiff has not provided evidence to create a genuine disputed issue of fact on that element.  Therefore, the Court grants summary judgment in favor of Defendant on Plaintiff's Title VII claim of disparate treatment asserted in Count Two.  (FAC ¶¶ 51-56.)

## C.    Disparate Impact Claim

In Count Two, Plaintiff also asserts that Defendant's policies had a discriminatory impact on non-Mormons, including Plaintiff.[8]  (FAC at ¶ 54.)  A disparate impact claim challenges "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity."  *Stout v. Potter*, 276 F.3d 1118, 1121 (9th Cir. 2002).  A prima facie case of disparate impact requires the plaintiff to: (1) identify the specific practices or policies being challenged; (2) show disparate impact; and (3) prove causation.  *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990).  To survive summary judgment on a disparate impact claim, a plaintiff must provide at least some evidence, direct or

---

[8] Defendant moves for summary judgment on Plaintiff's disparate impact claims based on religious and age discrimination.  (Doc. 56 at 10-13.)  The Court does not consider Defendant's argument related to a disparate impact claim based on age because Plaintiff states that Defendant "mischaracterizes" his age discrimination claim as a disparate impact claim.  (Doc. 67 at 15 n.6.)  Based on Plaintiff's statement, the Court concludes that he does not present an age-related disparate impact claim.

circumstantial, that a facially neutral policy falls more harshly on a protected group than the whole. *Lopez v. Pac. Maritime Ass'n*, 657 F.3d 762, 766 (9th Cir. 2011). To establish causation, the plaintiff must offer "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of [a particular group] because of their membership in a protected group." *Rose*, 902 F.2d at 1424 (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988)). Although statistical data alone may be adequate to prove causation, the statistical disparities must be sufficiently substantial that they raise an inference of causation. *Stout*, 276 F.3d at 1122.

As discussed below, Plaintiff's disparate impact claim fails. To establish a disparate impact claim, Plaintiff must identify "the specific . . . practice[s] that are allegedly responsible for any observed statistical disparities." *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005). As Defendant argues, Plaintiff has not identified the specific employment practice or selection criteria at issue. (Doc. 56 at 11.) Plaintiff does not respond to this argument. (Doc. 67.) However, the FAC alleges that KRMC's use of "facially neutral employment practices" and "excessive subjective standards for selection of those to be promoted demoted, discharged or disciplined" disparately impacts non-Mormon employees. (FAC at ¶ 54.) Additionally, in response to the motion for summary judgment Plaintiff generally asserts that KRMC had "Well-Known Discriminatory Employment Practices," however, Plaintiff does not dispute that he has failed to identify any specific employment practices or selection criteria that caused an adverse disparate impact on non-Mormons. (Doc. 67 at 7-8, 12-13); *see Stout*, 276 F.3d at 112.

Additionally, Plaintiff has not presented evidence to establish a genuine issue of fact on causation. To satisfy this element, Plaintiff must produce evidence to justify an inference that the challenged employment practice caused a substantial disproportionate exclusionary impact on the protected class. *See Shutt v. Sandoz Crop Prot. Corp.*, 944 F.2d 1431, 1433 (9th Cir. 1991). The primary means of proving such an impact is to present statistical evidence. *Id*. In its motion for summary judgment, Defendant asserts that the only potential statistical evidence is a chart that Plaintiff created and submitted to the

EEOC in April 2015 (the "chart"). (Doc. 56 at 12; DSOF ¶ 71.) Defendant argues that the chart is unreliable. (Doc. 56 at 12); *see More v. Hughes Helicopters, Inc., a Div. of Summa Corp.*, 708 F.2d 475, 481 (9th Cir. 1983) (stating that an employer may rebut the employee's prima facie case by showing the inaccuracy of the employee's statistics). Plaintiff does not rely on this chart, or any other statistical evidence, to oppose the motion for summary judgment. (Doc. 67 at 12-14.) Because Plaintiff does not rely on the chart, the Court will not consider it as evidence. Upon review of Plaintiff's response to the motion for summary judgment, the Court concludes that Plaintiff has not offered evidence that is sufficient to create a disputed issue of fact on the causation element of a prima facie case for a disparate impact claim under Title VII. Therefore, the Court grants summary judgment in favor of Defendant on Plaintiff's disparate impact claim asserted in Count Two of the FAC.

## IV.    Count Three—ADEA Claim

In Count Three, Plaintiff alleges a disparate treatment claim based on age discrimination in violation of the ADEA.[9] (FAC ¶¶ 57-62.) The ADEA makes it unlawful "to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). This prohibition is "limited to individuals who are at least 40 years of age." 29 U.S.C. § 631(a). To survive summary judgment on his claim for a violation of the ADEA under a disparate treatment theory of liability, Plaintiff must first establish a prima facie case of age discrimination. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1280-81 (9th Cir. 2000).

If he succeeds, the burden of production shifts to Defendant to articulate a legitimate non-discriminatory reason for its adverse employment action. *Id.* at 1281. Then, Plaintiff must demonstrate that there is a material genuine issue of fact on whether Defendant's proferred reason is pretext for age discrimination. *Id.* At trial, Plaintiff has the burden of proving that age was the "but-for" cause of the adverse employment action. *See Shelley v. Geren*, 666 F.3d 559, 607 (9th Cir. 2012) (explaining that, following the decision in *Gross*

---

[9]    Plaintiff has clarified that he is not bringing a disparate impact claim of age discrimination. (Doc. 67 at 15 n.6.)

*v. FBL Fin. Servs, Inc.*, 557 U.S. 167, 176-177 (2009), the *McDonnell Douglas* framework still applies to decide summary judgment motions and that at trial a plaintiff must show that age was the "but for" cause of the employer's adverse action).

### A.    Plaintiff's Prima Facie Case of Age Discrimination

To state a prima facie case of age discrimination under the ADEA, Plaintiff must show that (1) he belongs to a protected class, (2) he was performing his job satisfactorily, (3) he suffered an adverse employment action, and (4) he was replaced by substantially younger employees with equal or inferior qualifications.  *Coleman*, 232 F.3d at 1281; *see also O'Connor v Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) ("Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class.").  The requisite degree of proof to establish a prima facie case is "minimal," and plaintiff "need only offer evidence which gives rise to an inference of unlawful discrimination." *Wallis v. J.R. Simplot*, 26 F.3d 885, 889 (9th Cir. 1994).

The parties agree that Plaintiff has established the first element (member of protected class) and third element (suffered an adverse employment action) of his prima facie case.  The parties, however, dispute the second element (satisfactory job performance) and fourth element (replaced by substantially younger, less qualified employee) of the prima facie case.  As set forth above in Sections I.A and III.B, the Court concludes there is sufficient evidence to create a genuine dispute whether Plaintiff was performing his job satisfactorily at the time of his termination.  Thus, Plaintiff has established this element for purposes of defeating summary judgment.  On the fourth element, Defendant argues that Plaintiff fails to establish that he was discharged under circumstances giving rise to an inference of age discrimination.  A plaintiff can satisfy this element by showing the employee was "replaced by [a] substantially younger employee[ ] with equal or inferior qualifications." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207-08 (9th Cir. 2008).  As discussed below, Defendant disputes whether Dr. Braze was substantially

younger, whether she replaced Plaintiff, and whether there is evidence to support an inference of discrimination.

### 1. Substantially Younger Employee

Defendant argues that Plaintiff cannot satisfy the fourth element of the prima facie case because Dr. Braze was over 40 years old when KRMC hired her. (Doc. 56 at 15-16; DSOF ¶¶ 94-95.) Although Dr. Braze was in the protected class for purposes of the ADEA, that does not defeat Plaintiff's claim of age discrimination. *See O'Connor*, 517 U.S. at 312 (stating that the fact that "one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out because of his age."); *see also Harris v. Potter*, 2002 WL 31298852, at *3-*4 (N.D. Cal. Oct. 8, 2002) (stating that regardless of the replacement's age, a significant age difference is sufficient to make out a "low threshold" prima facie case) (citing *Douglas v. Anderson*, 656 F.2d 528, 538 (9th Cir. 1981) (finding that the replacement of a 54-year-old plaintiff by a 50-year-old person was sufficient to state a prima facie case). Plaintiff was 56 years old at the time of his termination and Dr. Braze was no older than 45 years old. (Doc. 67 at 8; DSOF ¶ 85, PSSOF, Ex. G.) Thus, the age difference between Plaintiff and Dr. Braze is sufficient to state a prima facie case.

### 2. Replaced Plaintiff

Defendant also asserts that Plaintiff cannot make a showing at the fourth element of the prima facie case because there is no evidence that Dr. Braze replaced Plaintiff because she was hired several months before Plaintiff was terminated. (Doc. 56 at 14.) Defendant states that three months before Plaintiff's termination, it hired Dr. Braze to service new patients in KRMC's ENT practice. (DSOF ¶¶ 81-86.) Defendant asserts that Plaintiff did not believe that Dr. Braze "[took] over [his] practice" and admitted that they did not share patients during the several months they worked together. (*Id*. at ¶¶ 84-87.) Additionally, Dr. Braze hired her own medical assistant. (*Id*.) Defendant admits that it did not hire a second ENT doctor after Plaintiff's termination but claims it was not necessary because Dr. Braze had improved the efficiency of the ENT practice. (*Id*. at ¶ 88.)

Plaintiff alleges that Dr. Braze did not help with his patient work load, but rather used "his office equipment and staff and otherwise ignored him." (Ramirez Decl. ¶ 52.) Furthermore, as Plaintiff argues, in its communications with the EEOC, KRMC initially stated that Dr. Braze was hired to replace Plaintiff in a response to the EEOC's request for information, but later retracted that statement. (PSSOF ¶¶ 81, 83; PSSOF, Exs. H, G.) Although Dr. Braze was hired before Plaintiff was terminated, Defendant initially stated to the EEOC that Dr. Braze was hired to replace Plaintiff, Dr. Braze did not work with Plaintiff in KRMC's ENT practice, and Defendant did not hire an ENT doctor after terminating Plaintiff. Thus, the Court concludes that Plaintiff has provided sufficient evidence to state a prima facie case on the "replacement" aspect of the fourth element.

### 3. Inference of Discrimination

Defendant further argues that Plaintiff cannot establish the fourth element of the prima facie case because he was not terminated under circumstances giving rise to an inference of age discrimination. (Doc. 56 at 15 (citing *Diaz,* 521 F.3d at 1207. Plaintiff can satisfy the fourth element of the prima facie case either by showing that he was replaced by a substantially younger employee with equal or inferior qualifications or that he was discharged under circumstances otherwise "giving rise to an inference of age discrimination." *Coleman*, 232 F.3d at 1281. As set forth above, there is evidence that Dr. Braze was substantially younger than Plaintiff and was hired to replace Plaintiff. Thus, there is a genuine issue on whether Plaintiff was replaced by a younger worker and the Court need not consider this alternative manner for satisfying the fourth element of the prima facie case.

At trial, Plaintiff will have the burden of proving that age was the "but-for" cause of the adverse employment action. *See Shelley*, 666 F.3d at 607. But he does not need to make that showing on summary judgment. *Id.* (explaining that, following the decision in *Gross*, 557 U.S. at 176-177, the *McDonnell Douglas* framework still applies to decide summary judgment motions, but at trial a plaintiff must show that age was the "but for" cause of the employer's adverse action).

**B.    Defendant's Legitimate Non-Discriminatory Reasons for Termination**

Defendant argues that, even if Plaintiff has established a prima facie case, it had legitimate, nondiscriminatory reasons for terminating Plaintiff based on his "poor performance."  (Doc. 56 at 10.)   Defendant identifies those "performance issues" as Plaintiff's poor productivity, his late starts in the operating room, his resistance to the implementation of EMR, his continued prescription of Tylenol with Codeine, and the potential EMTALA violation.  (*Id*. at 2-6.)   Defendant's proffered reasons for terminating Plaintiff are sufficient to satisfy its burden at this step of the *McDonnell Douglas* analysis. *See Reeves v. Sanderson Plumbing Prods, Inc*., 530 U.S. 133, 142 (2000) ("Th[e] burden [of showing a legitimate and non-discriminatory reason for an adverse employment action] is one of production, not persuasion; it 'can involve no credibility assessment.'") (citation omitted).  Thus, the burden shifts to Plaintiff to show evidence of pretext.

**C.    Demonstrating Pretext for Discrimination**

At the final stage of the *McDonnell Douglas* analysis, the burden shifts back to Plaintiff to raise "a triable issue of material fact" on whether Defendant's proffered reasons for the adverse employment actions are "mere pretext for unlawful discrimination." *Hawn* v. *Exec. Jet Mgmt, Inc*., 615 F.3d 1151, 1155 (9th Cir. 2010).  "A plaintiff can show pretext directly, by showing that discrimination more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003).   Direct evidence usually consists of "clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Coghlan v. Am. Seafoods Co*., 413 F.3d 1090, 1094–95 (9th Cir. 2005); *Earl v. Nielsen Media Research, Inc*., 658 F.3d 1108, 1113 (9th Cir. 2011) (holding that "comments from supervisors betraying bias or animus against older workers" constitute direct evidence of age discrimination). "Because direct evidence is so probative, the plaintiff need offer 'very little direct evidence to raise a genuine issue of material fact.'"  *Id*. at 1095. In contrast, circumstantial evidence constitutes "evidence that requires an additional inferential step to demonstrate discrimination."  *Id*. at 1095.  A plaintiff's circumstantial evidence must be

both specific and substantial to survive summary judgment. *Becerril v. Pima Cty. Assessor's Office*, 587 F.3d 1162, 1163 (9th Cir. 2009).

Plaintiff argues that he has offered evidence of pretext to survive a motion for summary judgment. (Doc. 67 at 8-11, 13, 15-16.) Plaintiff relies on the same evidence to establish pretext that he relied on to state a prima facie case. (*See id*. at 13.) Specifically, Plaintiff alleges that he can meet this burden because KRMC deviated from its policy. (Doc. 67 at 13 (citing *Franks v. City of Santa Ana*, 735 Fed. App'x 305, 306(9th Cir. 2018).) In *Franks*, the Ninth Circuit stated that plaintiff can show pretext by showing "that there was a deviation from [his employer's procedure] that worked to her disadvantage." *Franks*, 735 Fed. App'x at 307 (finding that plaintiff met her burden of showing pretext when there was evidence of numerous violations regarding police force procedure related to an investigation of a complaint against plaintiff that led to her placement on administrative leave) (citing *Earl v. Nielsen Media Research, Inc*., 658 F.3d 1108, 1117 (9th Cir. 2011)). In his discussion of pretext, Plaintiff does not specifically identify the policy from which KRMC deviated. (Doc. 67 at 13.) However, in support of his statement of facts, Plaintiff cites evidence that KRMC had a policy of documenting disciplinary or important meetings with physicians and that Turney and Blanchard did not document meetings with Plaintiff regarding his productivity. *See* Section I.

Plaintiff also cites *Riddle v. Washington*, 2011 WL 5024195, at *2 (9th Cir. 2011), for the proposition that a plaintiff can establish pretext based on a "lack of documentation." (Doc. 67 at 13.) In *Riddle*, the court noted that the plaintiff's "evidence of pretext [was] speculative, hearsay or self-serving, but there [was] enough admissible evidence that, construed most favorably to [plaintiff was] sufficient to defeat [the] motion for summary judgment. *Riddle*, 2011 WL 5024195, at *1. That evidence was an absence from the plaintiff's employment file of "references to the violations the purportedly caused [defendant] to lose all faith in [plaintiff]." *Id*. In this case, similar to *Riddle*, Plaintiff has presented Turney's and Blanchard's deposition testimony that they did not document their meetings with Plaintiff regarding his productivity, one of the asserted reasons for his

termination, and that Blanchard did not add anything to Plaintiff's personnel file. *See* Section I.

Plaintiff further argues that he can establish pretext because KRMC gave shifting, changing, or inconsistent reasons for his termination. (Doc. 67 at 13 (citing *Maxwell v. Verde Valley Ambulance Co., Inc.*, 2014 WL 4470512, at *10-*11 (D. Ariz. Sept. 11, 2014).) "Inconsistences, contradictions, or shifting explanations for terminating an employee tend to show that an employer's proffered reason for terminating that employee is pretext." *Maxwell*, 2014 WL 4470512, at *11 (citing *Payne v. Norwest Corp*., 113 F.3d 1079, 1080 (9th Cir. 1997) (holding that the shifting explanation creates a material issue of fact because a "rational trier of fact could find that the [ ] varying reasons show that the stated reason was pretextual")).

Plaintiff has presented evidence that Defendant offered various reasons for his termination. (*See* Doc. 67 at 8.) In a January 31, 2014 termination letter, Defendant stated that it was terminating Plaintiff without cause and did provide any specific reason for his termination. (*See* DSOF, Exs. 21, 31.) In a December 2014 position statement with the EEOC, Defendant stated that it terminated Plaintiff's employment contract without cause. (PSSOF, Ex. F.) In the portion of its EEOC position statement discussing the legitimate reasons for Plaintiff's termination, Defendant stated that it terminated Plaintiff due to his "utter lack of productivity." (*Id*.; Doc. 68-1 at 365.) Defendant stated that it gave Plaintiff the opportunity to keep his job by improving his productivity or by decreasing his salary to reflect his low productivity. (*Id*.) In a section of its EEOC position statement describing Plaintiff's "poor productivity," Defendant discussed ways in which Plaintiff had "cost KRMC money" including his failure to generate sufficient RVUs compared to his compensation, inefficient use of OR block time, referral of patients to outside clinics, refusal to collect co-pays from patients, and a failure to comply with EMR protocols, which cost KRMC because it led to bills not being collected. (PSSOF, Ex. F.) In its EEOC position statement, Defendant cast these productivity issues as financial burdens to KRMC. (*Id*.)

In this proceeding, Defendant has stated that it terminated Plaintiff because of his "multiple concerns" about his "performance and attitude." (DSOF ¶ 4; Blanchard Depo. at 66-69, 88-89; Merritt Depo. at 39, 88-89; Turney Depo. at 154.) In addition to the reasons provided in its EEOC position statement, Defendant asserts that that it terminated Plaintiff based on his "attitude," his continued prescription of Tylenol with Codeine after the death of pediatric patient in June 2013, and a potential EMTALA violation. (DSOF ¶ 4; Doc. 56 at 4-5, 7-8.) Evidence that Defendant offered at least some reasons for Plaintiff's termination in this proceeding that it did not include its EEOC position statement is sufficient to create a triable issue on pretext.

The Court concludes that Plaintiff has shown a material issue of fact regarding whether Defendant's proffered reasons for his termination were pretextual. The Court, therefore, denies Defendant's motion for summary judgment on the ADEA disparate treatment claim asserted in Count Three.

## V. Retaliation Claim

In Count Five, Plaintiff asserts a claim of retaliation in violation of Title VII and the ADEA. (FAC at ¶ 65-68.) Plaintiff alleges KRMC retaliated against him in violation of Title VII and the ADEA when, after he filed his post-termination EEOC charge in September 2014, KRMC settled the M.G. Lawsuit against Plaintiff's wishes in approximately November 2015 and refused "to provide Plaintiff either with counsel or reimbursement for his legal costs associated with the Arizona Medical Board inquiry" on or about December 8, 2015. (FAC ¶ 65; DSOF ¶ 36.) Defendant argues that these claims were not asserted in Plaintiff's EEOC charge of discrimination and are time barred. (Doc. 56 at 16-17.)

Exhausting administrative remedies by filing a timely charge with the EEOC or the appropriate state agency is a statutory pre-requisite for an employee to pursue litigation under both Title VII and the ADEA. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1947); 29 U.S.C. § 626(d)(1). The court's jurisdiction includes "[i]ncidents of discrimination not included in an EEOC charge" if "the new claims are like or reasonably

related to the allegations contained in the EEOC charge.*" Green v. Los Angeles Cty Superintendent of Sch.*, 883 F.2d 1472, 1475–76 (9th Cir. 1989) (internal quotation marks omitted); *see also Lyons v. England*, 307 F.3d 1092, 1104 (9th Cir. 2002)).   When "determining whether an allegation . . . is like or reasonably related to allegations contained in a previous EEOC charge, the court inquires whether the original EEOC investigation would have encompassed the additional charges." *Green*, 838 F.2d at 1475-76.  The court "should consider a plaintiff's claims to be reasonably related to allegations in the charge to the extent that those claims are consistent with the plaintiff's original theory of the case." *B.K.B. v. Maui Police Dep't.*, 276 F.3d 1091, 1100 (9th Cir. 2002).

Plaintiff does not directly address whether his EEOC charge did not include a retaliation claim.  (Doc. 67 at 16.)  Rather, Plaintiff argues that he was not required to exhaust his claims of retaliation because the alleged retaliation occurred after he filed his EEOC charge, but before the EEOC issued its right to sue letter.  (Doc. 67 at 16 (citing *Lyons*, 307 F.3d at 1104).)  *Lyons*, however, does not support Plaintiff's argument that his claims of retaliation that were not included in his EEOC charge are automatically administratively exhausted simply because the charge was pending when the alleged retaliation occurred.  Rather, Plaintiff must demonstrate that those alleged incidents of retaliation are like or reasonably related to the allegations in the charge.  *See Green*, 883 F.2d at 1475-76; *see also Lyons*, 307 F.3d at 1108.  Plaintiff does not provide any argument that his retaliation claims are like or reasonably related to the allegations in his EEOC charge.  (Doc. 67.)

Defendant argues that Plaintiff's retaliation claims do not meet this standard.  (Doc. 74 at 10.)  The Court agrees.  Plaintiff's relation claims relate to the M.G. Lawsuit and the AMB inquiry and are unrelated to the allegations of discrimination related to his termination.  The allegations in the EEOC charge of discrimination relate to Plaintiff's termination and KRMC's alleged discriminatory hiring and firing practices, and do not mention retaliation.  Additionally, the events alleged in the charge of discrimination occurred between late 2012 and January 2014, well before Defendant resolved the M.G.

1   Lawsuit in November 2015, and considered Plaintiff's request for legal counsel associated

2   with the AMB inquiry in December 2015. Thus, the EEOC could not have been reasonably

3   expected to investigate Plaintiff's allegations of retaliation as related to the allegations in

4   the EEOC charge. Plaintiff did not exhaust his retaliation claims and those claims are not

5   "like or reasonably related to" the claims he exhausted.

6         "[S]ubstantial compliance with the presentment of discrimination complaints to an

7   appropriate administrative agency is a jurisdictional prerequisite." *Sommatino v. United*

8   *States*, 255 F.3d 704, 708 (9th Cir. 2001). When an employee entirely fails to exhaust a

9   claim and the claim is not "like or reasonably related to" one that has been exhausted, the

10  court lacks jurisdiction to consider the claim. *Id.* at 709 (stating that "[i]n cases where the

11  plaintiff has never presented a discrimination complaint to the appropriate administrative

12  authority, the district court does not have subject matter jurisdiction."). Because Plaintiff

13  has not substantially complied with the exhaustion requirement for his retaliation claims,

14  those claims must be dismissed for lack of jurisdiction.

15  **VI.**    **Conclusion**

16        For these reasons, the Court grants summary judgment in favor of Defendant on

17  Plaintiff's claims of discriminatory termination in violation of Title VII-Religion (Count

18  Two) and denies summary judgment on Plaintiff's claim of discriminatory termination in

19  violation of the ADEA (Count Three). The Court also dismisses Plaintiff's retaliation

20  claims in violation of Title VII and the ADEA (Count Five) for lack of jurisdiction.

21        Accordingly,

22        **IT IS ORDERED** that Defendant's motion for summary judgment (Doc. 56) is

23  **GRANTED** in part and **DENIED** in part as follows:

24        1.     The Court **GRANTS** summary judgment in favor of Defendant on Plaintiff's

25  claims of discriminatory termination in violation of Title VII–Religion (Count Two).

26        2.     The Court **DENIES** summary judgment on Plaintiff's claim of

27  discriminatory termination in violation of the ADEA (Count Three).

28

3. The Court **DISMISSES** Plaintiff's retaliation claim in violation of Title VII and the ADEA (Count Five) for lack of jurisdiction.

Dated this 15th day of March, 2019.


_____
Bridget S. Bade
United States Magistrate Judge